**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ABIDIAS DE JESUS SANTOS & MATHEUS DOS SANTOS**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**MARKWAYNE MULLIN, Secretary of the United States Department of Homeland Security; TIMOTHY BAPTISTE, Supervisory ICE Officer; PATRICIA HYDE, Field Office Director; DAVID WESLING, Acting Field Office Director for the Boston Field Office in Burlington, Massachusetts; and TODD LYONS, Acting Director of ICE,**<br><br>**Defendants.** | **Civ. No. 4:26-cv-11590-MRG** |

**MEMORANDUM & ORDER RE: MOTION FOR PRELIMINARY INJUNCTIVE RELIEF [ECF No. 1] AND MOTION TO DISMISS [ECF No. 14]**

**GUZMAN, J.**

## I. INTRODUCTION

Plaintiffs Abidias de Jesus Santos and Matheus Dos Santos bring this *ultra vires* action against Defendants, United States immigration officials (collectively, "Defendants"), alleging that Defendants exceeded their statutory authority under the Immigration and Nationality Act ("INA") when the Department of Homeland Security ("DHS") improperly placed both Plaintiffs in expedited removal proceedings pursuant to 8 U.S.C. § 1225(b)(1) ("Section 1225(b)(1)") rather than full removal proceedings under 8 U.S.C. § 1229a ("Section 1229a"). Plaintiffs argue that the expedited removal statute that Defendants rely on only applies to noncitizens who are "arriving in

the United States," 8 U.S.C. § 1225(b)(1)(A)(i), and that Plaintiffs do not meet this definitional requirement because they arrived in the United States in 2016, were granted humanitarian parole, and were allowed to live in the United States while complying with immigration reporting requirements over the last ten years. Plaintiffs do not contest their removability, nor do they request the Court to review the merits of a discretionary immigration decision in their cases. Rather, they allege that, by treating them as persons still "arriving in the United States" subject to expedited removal, Defendants exceed their statutory authority under the INA and violate Plaintiffs' due process rights.

## II. BACKGROUND

### A. Relevant Facts

The facts in this case are neither lengthy nor disputed. Plaintiffs Abidias de Jesus Santos and Matheus Dos Santos, father and son, presented themselves at the Paso Del Norte Port of Entry in El Paso, Texas on August 7, 2016. [Compl. ¶¶ 3, 18, 26–27, 42, ECF No. 1; Defs.' MTD Mem. at 8, ECF No. 15; DHS Records Reflecting Grant of Humanitarian Parole, ECF 1-2 at 7].[1] Plaintiffs are natives and citizens of Brazil. [Compl. ¶¶ 3, 26–27; Defs.' MTD Mem. at 8; DHS Records Reflecting Grant of Humanitarian Parole, ECF 1-2 at 7]. On the date of their arrival at the Paso Del Norte Port of Entry, DHS initiated expedited removal proceedings against Plaintiff Abidias[2] pursuant to § 1225(b)(1) as documented in the Notice and Order of Expedited Removal (Form I-860), based on an alleged inadmissibility under 8 U.S.C. § 1182(a)(7)(A)(i)(I). [Compl. ¶ 4; Defs.'

[1] The pagination used refers to the ECF pagination appearing at the top of documents filed on the docket.

[2] Plaintiff Abidias is the only one named in the attached Notice and Order of Expedited Removal [ECF No. 1-2 at 10–11], and the Court notes that Plaintiff Matheus was a juvenile at the time of entry into the United States [see Arrival Record, ECF No. 1-2 at 7].

MTD Mem. at 8; see Notice and Order of Expedited Removal, ECF No. 1-2 at 10–11]. During the initial encounter, Plaintiff Abidias expressed a fear of returning to Brazil and was thereafter referred for a credible fear interview, where he provided sworn testimony that individuals were repeatedly driving by his house in Brazil and, when he told them to stop, the men, armed with guns, threatened to kill him. [Compl. ¶ 5; Record of Sworn Statement in Proceedings, ECF No. 1-2 at 15].

On or about August 8, 2016, U.S. Customs and Border Protection ("CBP") exercised its statutory authority and granted Plaintiffs humanitarian parole from custody pursuant to 8 U.S.C. § 1182(d)(5)(A), which was set to expire on November 8, 2016. [Compl. ¶ 6; Defs.' MTD Mem. at 9; I-94 Arrival Record, ECF No. 1-2 at 6–7]. Following their release, Plaintiffs were placed under supervision and required to report to U.S. Immigration and Customs Enforcement ("ICE") at the agency's non-detained office located in Burlington, Massachusetts. [Compl. ¶ 8; DHS Records Reflecting Grant of Humanitarian Parole, ECF 1-2 at 6–8]. Although the grant of humanitarian parole had technically expired, it was never revoked in writing, and DHS records demonstrate that Plaintiff Abidias complied with reporting requirements, including scheduled appearances, for a period of nearly ten years. [Compl. ¶ 9; Pls.' MTD Opp'n Mem. ¶ 8, ECF No. 16].[3] On or about May 22, 2017, Plaintiffs filed a Form I-589, Application for Asylum and Withholding of Removal, which was received and acknowledged by United States Citizenship and Immigration Services ("USCIS") as pending. [Compl. at ¶ 39; Defs.' MTD Mem. at 9]. Following the application for asylum, Plaintiffs were authorized to remain in the United States while the asylum application was pending. [Compl. ¶ 40]. As stated, from 2016 to the present, Plaintiffs allege they lived in the

[3] Because Plaintiff Dos Santos was a juvenile when he entered the United States, he was not subjected to the same reporting requirements. [See I-94 Arrival Record, ECF No. 1-2 at 7].

United States with the full knowledge of DHS, complying with all reporting requirements, remaining steadily employed, filing taxes, and maintaining valid employment authorizations. [Id. ¶¶ 9, 41]. At no point during the years following Plaintiffs' parole, did DHS initiate removal proceedings against them under 8 U.S.C. § 1229a. [Id. ¶ 43; Defs.' MTD Mem. at 9].

At some time in early 2026, DHS "abruptly re-initiated expedited removal proceedings" and Plaintiffs were subjected to another credible fear interview. [Pls.' MTD Opp'n Mem. ¶ 9; Compl. ¶ 45; Defs.' MTD Mem. at 9]. The asylum officer issued a negative credible fear determination, which was reviewed and upheld by an Immigration Judge on or about March 10, 2026. [Compl. ¶ 46; Defs.' MTD Mem. at 9]. Under the governing statutory and regulatory framework, no administrative appeal to the Board of Immigration Appeals ("BIA") exists for such determinations. [Compl. ¶ 47]. Plaintiffs now face imminent removal under a process which they allege "does not legally apply to them" because they are not "arriving in the United States," were previously granted parole, and maintained continuous physical presence in the United States for greater than two years. [Id. ¶¶ 49–52, 57]. Plaintiffs do not contend that they are in ICE custody or that they have been specifically directed to depart the United States. [Defs.' MTD Mem. at 9; see generally, Compl.].

### B. Procedural History

Plaintiffs commenced this action on April 3, 2026, seeking a temporary restraining order ("TRO") preventing Defendants from removing them while this action was pending, and further seeking a preliminary injunction ("PI") maintaining the status quo and preventing Plaintiffs' removal during the pendency of this litigation. [Compl. ¶ 100]. Plaintiffs further seek injunctive relief that Defendants are barred from removing them under Section 1225(b)(1) and that Defendants may not execute any expedited removal order against Plaintiffs unless and until they

are placed in removal proceedings authorized by law under 8 U.S.C. § 1229a. [Id.] The Court issued a stay of removal and transfer order while ordering the Defendants to respond to the Complaint and motions for injunctive relief. [ECF No. 9]. In responding to the Complaint, Defendants filed a motion to dismiss alleging a lack of subject matter jurisdiction and failure to state a claim. [ECF No. 14; Defs.' MTD Mem.] Plaintiffs opposed the motion to dismiss. [Pls.' MTD Opp'n Mem.] The Court then issued a Show Cause Order requesting supplemental briefing on the issue of jurisdiction. [ECF No. 19]. The parties both responded [Defs.' Resp. to Show Cause Order, ECF No. 22; Pls.' Resp. to Show Cause Order, ECF No. 23]. Upon reviewing the responses to the Show Cause Order, the Court determined it had jurisdiction to hear the case such that a TRO hearing was appropriate. Subsequently, the Court held a hearing on the TRO/PI motion. [ECF No. 28]. After hearing argument from both sides, the Court granted a preliminary injunction without a bond requirement and issued the terms of which via electronic order. [Id. (listing terms of preliminary injunction)] This written Order provides the reasoning for granting the preliminary injunction.

For the sake of judicial efficiency, because the motion to dismiss is fully briefed and the Court is prepared to rule on the papers, this Order likewise considers Defendants' motion to dismiss.

## III. LEGAL STANDARDS

### A. Motion to Dismiss Standard

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim. [ECF No. 14]. "When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." Ayyadurai v.

Galvin, 560 F. Supp. 3d 406, 410 (D. Mass. 2021) (quoting Ne. Erectors Ass'n of BTEA v. Sec'y of Lab., 62 F.3d 37, 39 (1st Cir. 1995)).

"When a defendant moves to dismiss for lack of federal subject matter jurisdiction, 'the party invoking the jurisdiction of a federal court carries the burden of proving its existence.'" Johansen v. United States, 506 F.3d 65, 68 (1st Cir. 2007) (cleaned up) (quoting Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995), cert. denied, 515 U.S. 1144 (1995)). "If the party fails to demonstrate a basis for jurisdiction, the district court must grant the motion to dismiss." Id. The district court "must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor" when ruling on a Rule 12(b)(1) motion. Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010) (citing Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001)). A plaintiff cannot assert a proper jurisdictional basis "merely on unsupported conclusions or interpretations of law" or "[s]ubjective characterizations or conclusory descriptions of a general scenario which could be dominated by unpleaded facts[.]" Murphy, 45 F.3d at 522 (citations omitted). In evaluating whether the party has met its burden of proof, the court "may consider extrinsic materials and, to the extent it engages in jurisdictional factfinding, is free to test the truthfulness of the plaintiff's allegations." Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 37 (1st Cir. 2000).

Dismissal under Rule 12(b)(6) is appropriate "if, after accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of a plaintiff, the court determines that [the complaint] fails to state a claim upon which relief can be granted." Doe v. Williston Northampton Sch., 766 F. Supp. 2d 310, 311 (D. Mass. 2011) (internal quotations and citation omitted); Fed. R. Civ. P. 12(b)(6). A complaint must contain sufficient factual allegations to state a claim for relief that is "both actionable as a matter of law and 'plausible on its face.'" Williston Northampton Sch.,

766 F. Supp. 2d at 311–12 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). To survive a motion to dismiss, a complaint must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (citation omitted).

### B. Preliminary Injunction Standard

In their Complaint, Plaintiffs move for both temporary and preliminary injunctive relief. [Compl. ¶ 100]. "The standard for issuing a TRO 'is the same as for a preliminary injunction.'" Orkin v. Albert, 557 F. Supp. 3d 252, 256 (D. Mass. 2021) (quoting Bourgoin v. Sebelius, 928 F. Supp. 2d 258, 267 (D. Me. 2013)). In evaluating a motion for preliminary injunction, the Court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 17–18 (1st Cir. 2006) (alteration in original) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)). While the Court must consider all four factors, the likelihood of success on the merits is "the touchstone of the preliminary injunction inquiry[,]" and if a moving party fails to demonstrate that they are likely to succeed on their claims, "the remaining factors become matters of idle curiosity." Com. Bank & Tr. Co. v. Prop. Adm'rs, Inc., 252 F. Supp. 3d 14, 16 (D. Mass. 2017) (first quoting Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998); then quoting Maine Educ. Ass'n Benefits Tr. v. Cioppa, 695 F.3d 145, 152 (1st Cir. 2012)). The moving party – here, the Plaintiffs – bear

"the burden of establishing that these four factors weigh in its favor." Esso Standard Oil Co., 445 F.3d at 18 (citing Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)).

A movant's burden on a motion for preliminary injunction requires a "greater showing" than the standard for defeating a motion to dismiss. Faust v. Cabral, No. 12-11020-DJC, 2013 WL 3933021, at *9 (D. Mass. July 30, 2013) (quoting Cryer v. Spencer, No. 11-10654-DJC, 2012 WL 892883, at *9 (D. Mass. Mar. 15, 2012)). For example, "on a motion for a preliminary injunction, in determining whether the movant has demonstrated the four factors, the Court need not accept the allegations in the complaint as true and the plaintiff 'must offer proof beyond unverified allegations in the pleadings.'" Id. (quoting Strahan v. Roughead, No. 08-CV-10919-MLW, 2010 WL 4827880, at *10 (D. Mass. Nov. 22, 2010)); see also 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2949 (3d ed. 2013) (noting that "[e]vidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction"). While a ruling that a claim survives the plausibility standard of a motion to dismiss does not necessarily lead to a conclusion that a movant has "demonstrated a likelihood of success on the merits to warrant the entry of a preliminary injunction," it follows that where a movant has met the higher standard of likelihood of success on the merits, they have also met the standard for stating a claim upon which relief can be granted. Cf. Faust, 2013 WL 3933021, at *10–11 (finding allegations sufficient to surpass a motion to dismiss for failure to state a claim, but insufficient to establish likelihood of success on the merits for a preliminary injunction).

## IV. DISCUSSION

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendants raise four different statutory provisions, which they contend, bar this Court's judicial review of Plaintiffs' claims and deprive the Court of jurisdiction: 8 U.S.C. §§ 1252(g); 1252(b)(9); 1252(e); 1252(a)(2)(A). [See Defs.' MTD Mem. at 11–20; Defs.' Resp. to Show Cause Order, ECF No. 22]. The Court takes each one in turn, and as discussed below, finds that none of the statutory provisions bar judicial review of Plaintiffs' claims.

1. **8 U.S.C. § 1252(g) ("Section 1252(g)" or "§ 1252(g)")**

As amended by the REAL ID Act (2005), Section 1252(g) reads in relevant part:

> Exclusive Jurisdiction.—Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

8 U.S.C. § 1252(g).

The Supreme Court in Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 482–83 (1999) and again in Jennings v. Rodriguez, 583 U.S. 281, 294–95 (2018) considered the statutory bar on judicial review in Section 1252(g). In those cases, the Supreme Court emphasized that the statute bars judicial review for the three specifically listed actions by the Attorney General, *i.e.* any decision or action to (1) commence proceedings, (2) adjudicate cases, or (3) execute removal orders. Jennings, 583 U.S. at 294. The Court noted that the statute does not "sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General." Id. (internal quotation omitted).

The key question is whether Plaintiffs' action here amounts to a challenge of any of the three discretionary actions by the Attorney General. The Court concludes that it does not. The Plaintiffs do not challenge DHS' prosecutorial discretion. Rather, Plaintiffs challenge the agency's

*legal authority* to exercise such discretion when long-residing, noncitizens like the Plaintiffs are placed in an allegedly improper statutory scheme meant for recent arrivals.

The Defendants' citations to caselaw are unavailing and their representations of what certain cases hold verge on misrepresentation of the law. The Court begins with M.T. v. Edlow, No. 25-CV-2431-ABA, 2025 WL 3760738 (D. Md. Dec. 30, 2025), which the Defendants assert presents a "factually analogous" decision to the present matter where the court held that Section 1252(g) strips the court of jurisdiction over a similar claim. [Defs.' Resp. to Show Cause Order at 15]. Plaintiffs in the case were twelve individuals from Turkey and Tajikistan who entered the United States without valid visas. M.T., 2025 WL 3760738, at *1. Each individual was detained by USCIS before being released on parole. Id. Ten of the twelve plaintiffs completed a Form I-867A on arrival. Id. The government provided a notice and order of expedited removal (Form I-860) for each plaintiff on the same day or the day following their entrance and detainment by USCIS. Id. at *2. Plaintiffs claimed in the litigation that they were not properly served the I-860 forms. Id. at *3. Plaintiffs, while on parole, submitted timely affirmative asylum applications (Form I-589), which were subsequently denied because they had been issued a Form I-860. Id. at *2. The denial occurred prior to a credible fear screening process, and the USCIS notice informed plaintiffs they would receive notice of their credible fear interview appointments at a later date. Id. Plaintiffs sued, alleging that they were never served the I-860 forms initiating expedited removal, and sought a TRO to reinstate their asylum applications and prevent the government from detaining or removing them. Id. at *3.

The Defendants' use of this case is misleading. The issues in the case are primarily about service of the I-860 and the dismissal of the filed asylum applications (I-589), "which were the forms that, among other things, operated to commence expedited removal proceedings." Id.

Further, the plaintiffs in M.T. had not resided in the United States for a prolonged period before being subjected to expedited removal. The court determined that "[t]o grant Plaintiffs the relief they seek, the Court would be required to find that removal proceedings were not commenced against them or were commenced unlawfully. This, by definition, would force the Court to do what section 1252(g) expressly forbids: invalidate the government's commencement of removal proceedings." Id. at *4. In contrast, the Plaintiffs in this case are not seeking to invalidate the commencement of removal proceedings. Indeed, Plaintiffs "do not ask the Court to decide whether they are removable." [Pls.' Resp. to Show Cause Order at ¶ 11, ECF No. 23]. Instead, they are arguing that DHS lacks statutory authority to use expedited removal under § 1225(b)(1) against them, given that DHS paroled the Plaintiffs into the interior United States, supervised them for years, accepted Plaintiff Abidias' pending asylum application, and permitted both Plaintiffs to maintain continuous open residence for nearly a decade. [Id.] Plaintiffs concede that they are removable, but they seek placement in removal proceedings properly authorized by law under § 1229a. [Compl. ¶ 100(H)]. Accordingly, M.T. is distinguishable on both facts and legal reasoning from the present matter.

Other cases cited by the Defendants are distinguishable or non-binding on this Court. In Candra v. Cronen, the plaintiff brought a habeas action to challenge ICE's denial of his application to stay his removal until the BIA ruled on his motion to reopen his removal proceedings. 361 F. Supp. 3d 148, 154 (D. Mass. 2019). The court found that Section 1252(g) barred judicial review because:

> The decision to stay removal is part and parcel of the administrative process of executing a removal order: A decision not to grant a stay of removal is in effect a decision to execute a removal order, and vice versa. The denial of a stay application fits cleanly within the category of decisions that § 1252(g) bars courts from second-guessing.

Id. at 156.

Candra is distinguishable because, unlike here, the plaintiff asked the court to review discretionary decisions made by DHS officials and squarely contested his removability. The Defendants also cite Anderson v. Moniz, No. 21-11584-FDS, 2022 WL 375231, at *5 (D. Mass. Feb. 7, 2022) as an example where a court found it lacked jurisdiction under Section 1252(g) to resolve a claim that petitioner's placement in withholding-only proceedings rather than standard removal proceedings violated his due process rights. [Defs.' MTD Mem. at 18–19]. Factually, the cases are not similar. The plaintiff in Anderson was convicted of multiple state and federal crimes, had already presented his claim of credible fear to an immigration judge twice, and brought his claims through a habeas petition. 2022 WL 375231, at *1–2. The Anderson court drew its reasoning from Viana v. President of United States, No. 18-CV-222-LM, 2018 WL 1587474, at *2 (D.N.H. Apr. 2, 2018), which, like Candra, concerned a petition for stay of the plaintiff's impending removal order. Beyond the factual dissimilarities, the Court respectfully disagrees with the legal reasoning presented in Anderson and notes that the Anderson decision is not binding precedent on this Court. See Camreta v. Greene, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case").

The Court joins the conclusions of numerous district courts around the country that Section 1252(g) does not bar claims like the Plaintiffs' where the Court is asked to determine "whether agencies comply with federal law and their own regulations." E.V. v. Raycraft, No. 4:25-CV-2069, 2025 WL 3122837, at *7 (N.D. Ohio Nov. 7, 2025) (citing Mantena v. Johnson, 809 F.3d 721, 728–29 (2d Cir. 2015); Banjoko v. Rambosk, No. 2:26-CV-58-KCD-DNF, 2026 WL 772462, at *2 (M.D. Fla. Mar. 19, 2026) ("[Plaintiff] is not asking this Court to vacate his removal order or

to stop the Government from putting him on a plane. . . . The core of this case is . . . about whether the Government followed the law and its own regulations in that process."); Patel v. Tindall, 810 F. Supp. 3d 824 (W.D. Ky. 2025); Espinoza v. Kaiser, No. 1:25-CV-1101 JLT SKO, 2025 WL 2675785, at *9 (E.D. Cal. Sept. 18, 2025); Rodriguez Cabrera v. Mattos, 808 F. Supp. 3d 1159, 1173–74 (D. Nev. 2025) ("in cases where a noncitizen challenges the Attorney General's arguably discretionary decision on a purely legal basis as a 'violation [of] the Constitution' or 'INA,' courts have jurisdiction to review such decisions as 'premised on a lack of legal authority.'" (quoting Ibarra-Perez v. United States, 154 F.4th 989, 998 (9th Cir. 2025))); Villavicencio Calderon v. Sessions, 330 F. Supp. 3d 944, 954 (S.D.N.Y. 2018) ("Petitioner here does not challenge ICE's prosecutorial discretion. Rather, Petitioner challenges ICE's legal authority to exercise such discretion when the subject of the removal order also has a right to seek relief made available by the DHS. The Court's review of ICE's legal authority is not foreclosed by 8 U.S.C. § 1252(g).") (citing Zadvydas v. Davis, 533 U.S. 678 (2001)).

As a final basis, the Court notes that Plaintiffs have not yet received a Notice to Appear ("NTA"),[4] therefore, their claims do not "arise from the government's commencement of proceedings" because filing an NTA "in an immigration court is the action that commences removal proceedings[.]" Ozturk v. Hyde, 136 F.4th 382, 397–98 (2d Cir. 2025) (alteration adopted) (emphasis in original) (internal quotation marks and citation omitted) (finding the bar on judicial review in Section 1252(g) does not apply to a claim of unlawful detention where ICE detained the petitioner "***before*** an NTA was filed with the immigration court."); see Walizada v. Trump, No. 2:25-CV-00768, 2025 WL 3551972, at *5 (D. Vt. Dec. 11, 2025) ("§ 1252(g) does not deprive the

[4] June 25, 2026 Hr'g Tr. 7:21–24. *Rough copy on file with the Court*. [ECF No. 28].

court of jurisdiction" where petitioner challenges his detention which *preceded* the issuance of his NTA). In sum, Section 1252(g) does not bar Plaintiffs' claims.

**2. 8 U.S.C. § 1252(b)(9) ("Section 1252(b)(9)" or "§ 1252(b)(9)")**

Section 1252(b)(9) is entitled "Consolidation of questions for judicial review." As relevant, it reads:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under Section 2241 of Title 28, or any other habeas corpus provision . . . or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9).

The First Circuit reads Section 1252(b)(9) as a "judicial channeling provision, not a claim-barring one," noting, "[t]he provision, where applicable, only requires exhaustion of administrative procedures and the consolidation of claims for judicial review." Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec., 510 F.3d 1, 11 (1st Cir. 2007). In effect, "the statute channels federal court jurisdiction over 'such questions of law and fact' to the courts of appeals and explicitly bars all other methods of judicial review, including habeas." Id. at 9 (quoting 8 U.S.C. § 1252(b)(9)).

The First Circuit and the Supreme Court have both clarified that claims seeking review of a legal question that is remote from or independent of the removal process are not covered by Section 1252(b)(9). Id. at 10 ("To us, Congress's choice of phrase suggests that it did not intend section 1252(b)(9) to sweep within its scope claims with only a remote or attenuated connection to the removal of an alien."); Kong v. United States, 62 F.4th 608, 614 (1st Cir. 2023); see Jennings, 583 U.S. at 295 n.3 ("The question is not whether *detention* is an action taken to remove

an alien but whether *the legal questions* in this case arise from such an action" and finding plaintiffs' challenge to prolonged detention prior to removal raises "legal questions [that] are too remote from the actions taken to fall within the scope of § 1252(b)(9).").

"Given Congress's clear intention to channel, rather than bar, judicial review through the mechanism of section 1252(b)(9)," the First Circuit also carefully considers whether applying Section 1252(b)(9) would preclude judicial review of a claim overall. Aguilar, 510 F.3d at 11. In Aguilar, the First Circuit wrote,

> While legal and factual issues relating to [whether a particular alien should be deported] can be raised in removal proceedings and eventually brought to the court of appeals for judicial review, certain claims, by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings delineated in the [Immigration and Nationality Act ("INA")] . . . Requiring the exhaustion of those claims would foreclose them from any meaningful judicial review.

Id. Accordingly, "claims that cannot effectively be handled through the available administrative process" should be excluded from Section 1252(b)(9)'s judicial channeling. Id. Where plaintiffs are not challenging the validity of their orders of removal and where failing to exercise jurisdiction would "foreclose them from any meaningful judicial review" under the INA, Section 1252(b)(9) does not bar a Court's exercise of jurisdiction. See Jimenez v. Nielsen, 334 F. Supp. 3d 370, 381–82 (D. Mass. 2018).

In the Complaint, Plaintiffs argue that they are inappropriately being processed for expedited removal through § 1225(b)(1) and seek an order enjoining Defendants from executing any expedited removal order against Plaintiffs unless and until they are placed in removal proceedings authorized by law under § 1229a. [Compl. ¶ 100]. Plaintiffs assert that their claims are not subject to the judicial channeling provision because, "[t]his action is not a challenge to the 'implementation or operation' of an individual expedited removal order within the meaning of

those provisions. It is a classic *ultra vires* challenge to whether DHS possesses any statutory authority in 2026 to apply § 1225(b)(1) to these Plaintiffs under these undisputed facts." [Pls.' MTD Opp'n Mem. at 4]. In finding that Sections 1252(a)(5) and 1252(b)(9) do not strip the court of jurisdiction to hear a Due Process claim to stay detention and any order of removal so a petitioner could pursue a provisional unlawful presence waiver, the court in Calderon v. Sessions described how the petitioner's claim was "neither a direct nor indirect challenge to his removal order:"

> Petitioner claims only that he has a *right to seek access* to a lawful regulatory process that the DHS makes available to people in his precise position, and seeks review of ICE's legal authority in executing an order of removal notwithstanding his right. Looked at another way, Petitioner seeks consideration of his legitimate and authorized pursuit of an existing process *before* the government exercises its right to remove. That is not a claim of a right to remain in the United States.

330 F. Supp. 3d at 956. Similar to Calderon, Plaintiffs here are not challenging final orders of removal or seeking review of the credible fear determination, nor are they claiming a right to remain in the United States through this suit. They are seeking to be placed in a lawful regulatory process "*before* the government exercises its right to remove." See id.

Further, Plaintiffs' argument that they are improperly placed in expedited removal proceedings such that it violates their Due Process rights would escape judicial review under the INA. Administrative exhaustion under the INA and the process provided by Section 1225(b)(1) does not provide a means to raise the misclassification challenge articulated by Plaintiffs. The many limitations to judicial review regarding § 1225(b)(1) that the INA poses clearly demonstrate this point. Plaintiffs' suit rests outside of the INA because they are arguing Defendants acted beyond their statutory authority under the INA. Accordingly, Section 1252(b)(9) does not apply to Plaintiffs' claims. See Aguilar, 510 F.3d at 11; Jimenez, 334 F. Supp. 3d at 381–82.

**3. 8 U.S.C. § 1252(e) ("Section 1252(e)" or "§ 1252(e)")**

Section 1252(e)(1)(A) states in relevant part: "Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may . . . enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection." 8 U.S.C. § 1252(e)(1)(A).

Section 1252(e)(3)(A) preserves judicial review of systemic challenges to Section 1225(b) and its implementation, limited to determinations of "(i) whether such section, or any regulation issued to implement such section, is constitutional; or (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." Id. § 1252(e)(3)(A). Under the terms of the statute, any such systemic challenge must be brought in the United States District Court for the District of Columbia. Id. In response to the Court's Show Cause Order, Plaintiffs explicitly disclaim that they are raising a systemic challenge, rather they argue that this action is "case[-]specific and fact[-]bound . . . [to] their particular immigration history." [Pls.' Resp. to Show Cause Order at ¶ 42]. Nor are Plaintiffs seeking to invalidate a nationwide policy or directive. [Id. at ¶ 43]. Accordingly, the Court finds the jurisdictional carve out of Section 1252(e)(3)(A) to be irrelevant to this case.

Plaintiffs argue that "[i]f § 1225(b)(1) does not apply to Plaintiffs, then the statutory limits on review of the 'implementation' of § 1225(b)(1) do not apply to Plaintiffs' claims, consistent with Guerrero Orellana v. Moniz, 808 F. Supp. 3d 167 (D. Mass. 2025) ("Orellana II"), and 813 F. Supp. 3d 185 (D. Mass. 2025) ("Orellana III")." [Pls.' Resp. to Show Cause Order at ¶ 34]. In Orellana III, another session of this Court determined that Section 1252(e)'s restrictions on judicial

review do "not limit judicial review of [plaintiff's] claim that the government is unlawfully subjecting him and the other class members to mandatory detention under § 1225(b)(2)(A) because the mandatory detention provision does not apply at all." Orellana III, 813 F. Supp. 3d at 193 (quoting Orellana II, 808 F. Supp. 3d at 181). "In other words, since § 1225(b)(2)(A) 'does not govern the detention of individuals in [plaintiff's] position in the first place, he is not seeking judicial review of the "implementation" of § 1225(b).'" Id. This jurisdictional question gets to the merits of Plaintiffs' claims. If the Court determines that expedited removal under Section 1225(b)(1) does not apply to Plaintiffs because they are not "arriving aliens" as construed under the statute, the statutory limit on judicial review of implementation of Section 1225(b)(1) would be inapplicable to Plaintiffs' claims, like what the court determined in Orellana II and III. See id. Defendants' argument on this point also digs into the merits of Plaintiffs' claims. [See Defs.' Resp. to Show Cause Order at 7–13]. The Court is not one to hide the ball, and, as will be discussed in the analysis on the likelihood of success on the merits prong for a preliminary injunction, *infra,* the Court agrees with Plaintiffs. Like in Orellana II and III, the Court concludes that since Plaintiffs' claim is that expedited removal under Section 1225(b)(1) does not govern individuals in their position, they are not seeking judicial review of "an order to exclude an alien in accordance with section 1225(b)(1)" and Section 1252(e)(1)(A)'s bar does not apply. 8 U.S.C. § 1252(e)(1)(A).

**4. 8 U.S.C. § 1252(a)(2)(A) ("Section 1252(a)(2)(A)" or "§ 1252(a)(2)(A)")**

Section 1252(a)(2)(A) states:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review--
>
> **(i)** except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the

implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,

**(ii)** except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,

**(iii)** the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or

**(iv)** except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

8 U.S.C. § 1252(a)(2)(A).

As with the analysis above pertaining to Section 1252(e)(1)(A), Section 1252(a)(2)(A) concerns judicial review of implementation of Section 1225(b)(1). Where Plaintiffs can demonstrate that Section 1225(b)(1) does not apply to them at all, the Court follows the reasoning of Orellana II and III in finding that Plaintiffs are not seeking judicial review of the "'implementation' of § 1225(b)." See Orellana III, 813 F. Supp. 3d at 193 (quoting Orellana II, 808 F. Supp. 3d at 181). Thus, the statutory limit on judicial review of implementation of Section 1225(b)(1) found in Section 1252(a)(2)(A) is inapplicable to Plaintiffs' claims.

Having determined that the Court does not lack jurisdiction, the motion to dismiss for lack of subject matter jurisdiction is **DENIED**. The Court will next analyze Plaintiffs' motion for preliminary injunctive relief.

### B. Preliminary Injunction

As stated previously, in evaluating a motion for preliminary injunction, the Court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co., 445 F.3d at 17–18 (alteration in original) (quoting Bl(a)ck Tea Soc'y, 378 F.3d at 11). While likelihood of success on the merits is "the touchstone of the preliminary injunction inquiry[,]" the Court will first consider the other factors because they are easily met. Com. Bank & Tr. Co., 252 F. Supp. 3d at 16 (quoting Philip Morris, Inc., 159 F.3d at 674).

In terms of the risk of irreparable harm if the injunction is denied, Plaintiffs face possible expedited deportation from the United States to anywhere in the world without being afforded procedural protections that they would receive under proceedings pursuant to Section 1229a. Chogllo Chafla v. Scott, No. 2:25-CV-00437-SDN, 2025 WL 2531027, at *2 (D. Me. Sept. 2, 2025) (finding irreparable harm on similar facts). Once removed, Plaintiffs will lose their ability to pursue their legal claims and to remain in the United States where they have resided for years. [Compl. ¶ 93]. These circumstances demonstrate a risk of irreparable harm if preliminary injunctive relief is not granted. Salzar v. Robbins, No. 2:25-CV-05473-VBF-MAR, 2025 WL 2633128, at *4 (C.D. Cal. June 18, 2025) ("Imminent and potentially permanent removal from the country is obviously one of the most irreparable injuries one could suffer, particularly where Petitioner is still in the process of litigating his deportation case."); Alfonso v. Current Warden, Miramar ICE Field Off., No. 26-60257-CIV, 2026 WL 1180844, at *3 (S.D. Fla. Feb. 3, 2026) ("The minor 'harm' to the government in delaying Petitioner's removal proceedings until this Court determines whether Petitioner is properly removed expeditiously under section 1225(b)(1) or placed in standard section 1229a removal proceedings is far outweighed by the harm that Petitioner would experience if unlawfully removed from the country.")

The balance of equities and public interest prongs likewise weigh in Plaintiffs' favor. "These factors merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). "Although the Government has a legitimate interest in the 'prompt execution of

removal orders,' . . . 'there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm[.]'" Chogllo Chafla, 2025 WL 2531027, at *3 (first quoting Hernandez-Lara v. Lyons, 10 F.4th 19, 32 (1st Cir. 2021) then quoting Nken v. Holder, 556 U.S. 418, 436 (2009)). While the Court recognizes and appreciates Defendants' strong interest in enforcing federal immigration laws, "the Government has 'no public interest in perpetuating unlawful agency action.'" U.H.A., K.A. v. Bondi, 817 F.Supp.3d 752, 768 (D. Minn. 2026) (quoting Missouri v. Trump, 128 F.4th 979, 997 (8th Cir. 2025) (granting TRO to enjoin continued operation of certain DHS enforcement actions that violate the INA)). Moreover, "neither equity nor the public's interest are furthered by allowing violations of federal law to continue." Feitoza v. Noem, No. 4:26-CV-40011-MRG, 2026 WL 252422, at *6 (D. Mass. Jan. 30, 2026) (quoting Galvez v. Jaddou, 52 F.4th 821, 832 (9th Cir. 2022)). As discussed below, the Court finds that Plaintiffs can demonstrate a likelihood of success on the merits. Importantly, Plaintiffs' likelihood of success on the merits "lightens [Defendants'] stated interests." Huisha-Huisha v. Mayorkas, 27 F.4th 718, 734 (D.C. Cir. 2022). Therefore, where it is likely that Plaintiffs' removal/deportations will be wrongfully executed under an improper statutory framework and Plaintiffs have not had an opportunity to demonstrate the substantial harm that they might face should that occur, such circumstances offset the public's interest in prompt execution of removal orders. See Chogllo Chafla, 2025 WL 2531027, at *3; Feitoza, 2026 WL 252422, at *6; Nken, 556 U.S. at 436. Accordingly, the balance of equities and public interest support issuing preliminary injunctive relief.

Turning now to the likelihood of success on the merits, the Court finds the Plaintiffs have met their burden. "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success – rather, they must establish a 'strong likelihood' that they will

ultimately prevail." Sindicato Puertorriqueño de Trabajadores, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (citations omitted). A "plaintiff need only establish a likelihood of succeeding on the merits of any one of [its] claims for a preliminary injunction to be granted." President & Fellows of Harvard Coll. v. United States Dep't of Homeland Sec., 788 F. Supp. 3d 182, 209 (D. Mass. 2025) (internal quotation marks and citation omitted) (alteration in original); Feitoza, 2026 WL 252422, at *6 n.9 ("In a case where multiple claims are asserted, temporary injunctive relief may be warranted when substantial likelihood of success on the merits is shown on just one claim (citing Worthley v. Sch. Comm. of Gloucester, 652 F. Supp. 3d 204, 215 (D. Mass. 2023))).

For the purposes of the preliminary injunction standard, which only requires a showing of likelihood of success of the merits on just one claim, id., the Court will analyze Plaintiff's likelihood of success on the merits on Counts I and II,[5] which both assert claims for declaratory and injunctive relief that Defendants are exceeding their statutory authority under the INA. In doing so, the Court will review whether subjecting Plaintiffs to expedited removal under Section 1225(b)(1) would be improper.

**1. Statutory and Regulatory Framework.**

The principal issue presented by this case is one of statutory interpretation. Most if not all of the material facts are known, pleaded, and undisputed. As Plaintiffs summarize, "[i]f Plaintiffs are not 'arriving' within the meaning of § 1225(b)(1)(A)(i), and if they are excluded from the designation provision [of 8 U.S.C. § 1225(b)(1)(A)(iii)] because they were paroled on or about November 8, 2016 and have far more than two years of continuous physical presence (since at

[5] In considering the motion to dismiss for failure to state a claim, infra, the Court will consider Plaintiffs' due process claim in Count III and whether being subjected to Section 1225(b)(1) rather than another statutory framework, such as under 8 U.S.C. § 1229a, violates Plaintiffs' due process rights.

least August 2016), then they fall outside the statutory class Congress made subject to expedited removal." [Pls.' Resp. to Show Cause Order at ¶ 37; see Compl. ¶¶ 13–16, 48–51, 57–63].

**a. Statutory Interpretation**

To begin, the Court lays out the legal standards guiding statutory interpretation. In interpreting the statute, the Court looks to both the plain meaning of the relevant terms, and the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (quoting Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 809 (1989)). "A court must interpret the statute as a symmetrical and coherent regulatory scheme . . . and fit, if possible, all parts into a harmonious whole." Id. (internal citations and quotation marks omitted). The Supreme Court has varied on its view of the anti-surplusage canon, compare United States ex rel. Polansky v. Exec. Health Res., Inc., 599 U.S. 419, 432 (2023) ("[E]very clause and word of a statute should have meaning.") (internal quotation marks and citation omitted) and TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("'[N]o clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)) with Mullin v. Al Otro Lado, 146 S. Ct. 2079, 2092 (2026) ("The anti-surplusage canon is not an iron rule."). The High Court recently noted, "if forced to choose between an interpretation that entails some redundancy and one that contradicts what words usually mean, we would choose the former." Al Otro Lado, 146 S. Ct. at 2094 (citing United States v. Atlantic Research Corp., 551 U.S. 128, 137 (2007) (the anti-surplusage canon "does not require us to avoid surplusage at all costs")). Accordingly, a statutory construction analysis should prioritize words' ordinary meaning, courts may look to dictionary definitions in ascertaining ordinary or plain meaning, and a redundant interpretation trumps a contradictory interpretation.

See id. at 2090–91 (referring to the American Heritage Dictionary in interpreting the ordinary meaning of "arrives in" under 8 U.S.C. §§ 1158(a)(1) and 1225(a)(1)); id. at 2094.

Additionally, post-Loper Bright, courts must exercise independent judgment on statutory meaning rather than deferring to agencies. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 385 (2024) ("When the meaning of a statute [is] at issue, the judicial role [is] to interpret the act of Congress, in order to ascertain the rights of the parties.") (internal quotation marks and citation omitted). "[A]gencies have no special competence in resolving statutory ambiguities. Courts do." Id. at 373. Further, "[a]lthough in no way binding, an agency's implementing regulations can provide a useful reference point for understanding a statutory scheme, particularly where those regulations were 'issued roughly contemporaneously with enactment of the statute and [have] remained consistent over time.'" Martinez v. Hyde, 792 F. Supp. 3d 211, 219 (D. Mass. 2025), appeal dismissed sub nom. Diaz Martinez v. Hyde, No. 25-1902, 2025 WL 4670604 (1st Cir. Dec. 23, 2025) (second alteration in original) (quoting Loper Bright, 603 U.S. at 385–86)).

**b. Relevant Statutes**

Turning now to the statutes at issue, Section 1225(a) provides that "[a]n alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). An "[a]rriving alien" includes "an applicant for admission coming or attempting to come into the United States at a port-of-entry[.]" 8 C.F.R. § 1.2. Applicants for admission who arrive at the border or a port of entry "fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." Jennings, 583 U.S. at 287. Applicants covered by § 1225(b)(1) are removed "without further hearing or review" pursuant to an expedited removal process unless the person "indicates either an intention to apply for asylum . . . or a fear of persecution[,]" in which case that person is

referred for an asylum interview. 8 U.S.C. § 1225(b)(1)(A)(i)–(ii). Applicants covered by § 1225(b)(2) are placed in full removal proceedings under 8 U.S.C. § 1229a. 8 U.S.C. § 1225(b)(2)(A).

Expedited removal under § 1225(b)(1) covers two groups. The first group encompasses noncitizens "arriving in" the United States who lack valid documents or who are inadmissible due to fraud. 8 U.S.C. § 1225(b)(1)(A)(i) ("Arriving In Provision"). The second group encompasses noncitizens designated for expedited removal by the Secretary of Homeland Security within certain statutory limits. See 8 U.S.C. § 1225(b)(l)(A)(iii) ("Designation Provision"). The Designation Provision limits designation for expedited removal to the following: "An alien . . . who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(l)(A)(iii)(II).

In the present case, the Defendants expressly state that they are not relying on the Designation Provision in defending DHS's application of expedited removal to Plaintiffs but instead rely on DHS's "arriving in" authority under § 1225(b)(1)(A)(i). [Defs.' MTD Mem. at 5]. Plaintiffs plainly do not meet the requirements of the Designation Provision. They were paroled into the United States in August 2016 and have maintained continuous physical presence in the United States for the subsequent near decade. Thus, the key question is whether Plaintiffs qualify as "arriving in" under § 1225(b)(1)(A)(i).

The statutory text, read in context, strongly supports Plaintiffs' interpretation and counsels against Defendants' contention that Plaintiffs are "arriving in" under § 1225(b)(1)(A)(i). Defendants argue that, since Plaintiffs were issued expedited removal orders as "arriving aliens"

when they first entered the United States, the expedited removal orders were still valid and enforceable even after Plaintiffs' parole expired. [Defs.' MTD Mem. at 21].

The question of when a noncitizen is considered "arriving in" is intertwined with the portion of the INA that governs humanitarian parole, which provides an exception to detaining noncitizens while their immigration proceedings are adjudicated. The Supreme Court has interpreted both § 1225(b)(1) and § (b)(2) as "mandat[ing] detention of applicants for admission until certain proceedings have concluded." Jennings, 583 U.S. at 297. The "only exception" to this mandatory detention scheme is that "applicants for admission may be temporarily released on parole 'for urgent humanitarian reasons or significant public benefit'" pursuant to 8 U.S.C. § 1182(d)(5)(A). Mata Velasquez v. Kurzdorfer, 794 F. Supp. 3d 128, 139 (W.D.N.Y 2025) (quoting Jennings, 583 U.S. at 288). The parole statute provides that parole "shall not be regarded as an admission of the alien[,]" and when parole expires or is revoked, "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).

The implementing regulations concerning parole add more layers to the analysis. An "arriving alien" is defined in the regulations as "an applicant for admission coming or attempting to come into the United States at a port-of-entry" and such person "remains an arriving alien even if paroled" pursuant to 8 U.S.C. § 1182(d)(5) "and even after any such parole is terminated or revoked." 8 C.F.R. § 1.2. Pursuant to 8 C.F.R. § 235.3, certain classes of noncitizens are subject to expedited removal, including "arriving aliens, as defined by 8 CFR 1.2." Id. § 235.3(b)(l)(i). Finally, the regulations provide that upon expiration of parole, the noncitizen "shall be restored to the status that he or she had at the time of parole." Id. § 212.5(e)(2)(i).

The Defendants are asking this Court to find that expiration of Plaintiffs' humanitarian parole—a decade after arriving in the United States—renders them "arriving aliens" under § 1225(b)(1)(A)(i), and therefore subject to expedited removal. After careful consideration, the statutory text of § 1225(b)(1)(A)(i) cannot support the result the Defendants ask for here.

**c. The Plain Text**

Section 1225(b)(1)(A)(i) applies to a noncitizen "who is arriving in the United States." 8 U.S.C. § 1225(b)(1)(A)(i). In Mullin v. Al Otro Lado, the Supreme Court interpreted a similar phrase, "arrives in," and determined that, under an ordinary meaning, "[a] person arrives in a geographic location only when he enters it. To 'arrive' is to 'reach a destination,' and the preposition 'in' means '[w]ithin the limits, bounds, or area of' a place[.]" Al Otro Lado, 146 S. Ct. at 2090 (quoting *American Heritage Dictionary* 102 (def. 1), 910 (3d ed. 1992)). "On these definitions, a person arrives in a destination when he enters within its area—not before." Id. Under the same reasoning, "arriving in" refers to the present action of entering the destination of the United States.

Moreover, in the statute, Congress used the present participle "arriving in"—an active, ongoing description of someone currently in the process of reaching the country. 8 U.S.C. § 1225(b)(1)(A)(i). This is not a status label that attaches permanently upon first contact with the border. It describes what someone is doing at the moment of coming across. Someone who walked across the Rio Grande in 2016, was processed, paroled, and has lived in the Commonwealth for a decade is not "arriving" in any ordinary sense of that word. Their arrival is long complete.

Courts across the country have analyzed this grammatical point and reached the same conclusion. As another session of this Court noted in reflecting on "arriving in" as used in 8 C.F.R. § 1.2, "[t]he use of the present progressive tense 'arriving,' rather than the past tense 'arrived,'

implies some temporal or geographic limit." Martinez v. Hyde, 792 F. Supp. 3d 211, 219 (D. Mass. 2025), appeal dismissed sub nom. Diaz Martinez v. Hyde, No. 25-1902, 2025 WL 4670604 (1st Cir. Dec. 23, 2025) (quoting Matter of M-D-C-V-, 28 I. & N. Dec. 18, 23 (BIA 2020)). "In other words, an 'arriving alien' is an 'applicant' who is also *doing* something: 'coming or attempting to come into the United States.'" Id. (citing 8 C.F.R. § 1.2); Molina Ochoa v. Noem, No. 25-0881 JB/LF, 2026 WL 1256556, at *24 (D.N.M. May 7, 2026) ("Congress' use of the present participle 'arriving' . . . signals an imperfect or continuous aspect rather than a completed action[,]" which "applies to aliens who are in the process of inspection and arrival, and not to those whose entry [was] completed long ago. . . .") The Defendants' reading would require this Court to treat "arriving" as meaning "arrived at any point in the past"—a reading the plain text cannot support. As Judge Benita Pearson stated in a case presenting nearly identical facts: "It is nonsensical to now classify Petitioner as an 'arriving alien' subject to expedited removal ten years after permitting him to live and work in the country." Hernandez-Cine v. Voorhies, No. 4:26-CV-421, 2026 WL 972364, at *4 (N.D. Ohio Apr. 10, 2026). This Court agrees.

**d. Defendants Misread § 1182(d)(5)(A)**

The Defendants read § 1182(d)(5)(A)'s language—that upon parole expiration, the noncitizen's case continues "in the same manner as that of any other applicant for admission"—as restoring arriving alien status. However, as discussed in Coalition for Humane Immigrant Rights v. Noem, that reading is not supported by the statute. 805 F. Supp. 3d 48, 85–86 (D.D.C. 2025), injunction vacated on other grounds, No. 25-5289 (D.C. Cir. Aug. 11, 2026).[6] The statutory

---

[6] On August 11, 2026, the U.S. Court of Appeals for the D.C. Circuit issued a per curiam decision holding that the plaintiffs lacked Article III standing and vacating the district court's stay on grounds not applicable to this Order. The D.C. Circuit did not decide whether 8 U.S.C. § 1225(b)(1)(A)(i)'s "arriving in" authority permits DHS to subject parolees to expedited removal. Instead, because the plaintiffs had not challenged 8 C.F.R. § 1.2—the regulation that treats a

provision provides that two actions may occur to a parolee when his parole expires: (1) he "shall forthwith return or be returned to the custody from which he was paroled"; and (2) "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). In other words, by the terms of the statute, "the noncitizen is physically brought back into immigration detention ('custody') and then legally continues to be treated as an 'applicant for admission,' because his parole itself did not constitute an admission." Coal. for Humane Immigrant Rts., 805 F. Supp. 3d at 85; see 8 U.S.C. § 1182(d)(5)(A) (stating that parole "shall not be regarded as an admission of the alien"). Thus, the parole statute "recognizes that the parole physically happened, because it contemplates that the noncitizen must be returned to detention[,]" and more importantly here, "it does not imply a *return* to the status of an applicant for admission, because a noncitizen is already an 'applicant[ ] for admission' while their parole is active." Coal. for Humane Immigrant Rts., 805 F. Supp. 3d at 86 (citing Biden v. Texas, 597 U.S. 785, 806 (2022) ("[T]he INA expressly authorizes DHS to process applicants for admission under a third option: parole.")). In sum, "the statute says that the noncitizen whose parole is terminated 'continue[s]' to be treated as an applicant for admission, not that she 'returns' to the status of applicant for admission." Id. (alteration in original).

This reading is supported by Guerrero Orellana v. Moniz, Nos. 25-2152, 26-1094 (1st Cir., Aug. 13, 2026) ("Orellana IV"). In Orellana IV, the First Circuit considered whether noncitizens who are present in the United States after entering without inspection are subject to mandatory, no-bond detention under 8 U.S.C. § 1225(b)(2)(A), or whether they fall instead under § 1226(a), which permits release on bond or conditional parole. Although Orellana IV addressed a different

parolee as an "arriving alien"—the court concluded that the plaintiffs' standing did not turn on the legality of that regulatory framework. Coal. for Humane Immigrant Rts. v. Mullin, No. 25-5289, n.1 (D.C. Cir. Aug. 11, 2026).

statutory provision, its analysis is instructive. As part of the analysis, the panel majority considered the meaning of "seeking admission" and "applicant for admission" under the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), a 1996 law that made significant changes to the INA. Id. at *17–20. The court reasoned that because "admission" is statutorily defined as lawful entry after inspection and authorization, 8 U.S.C. § 1101(a)(13)(A), a person who has already entered unlawfully cannot logically be "seeking" that lawful entry—the seeking must occur at the time of the encounter, i.e., at the border/port of entry. Id. at *19–21. Because the plaintiffs in Orellana IV had already entered the United States, albeit unlawfully, they are not "seeking admission," and "[t]o conclude otherwise would defy the plain language of the statute." Id. at *20. The court further rejected the government's assertion that all "applicants for admission" are "necessarily seeking admission," id. at *29; using the example of "advance parole," the court reasoned that "being 'paroled' into the country [is] a distinct concept from being 'admitted,'" so noncitizens in the United States under advance parole are "applicants for admission" but are not "seeking admission" because they have already arrived, id. at *38. In holding that "noncitizens like Guerrero Orellana who are present in the United States without admission are not subject to § 1225(b)(2)(A)'s mandatory detention provision, but rather, are governed by § 1226," the First Circuit effectively narrowed the "entry-fiction" logic of treating interior noncitizens as legally frozen in a "seeking admission" status forever simply because the statute deems them "applicants for admission." Id. at *34 (citations omitted). Accordingly, Orellana IV expressly undermines Defendants' position in this case because Plaintiffs' status as "applicants for admission" even through expiration of their parole does not erase the reality that they are not presently "arriving in" the United States, just as they are not "seeking admission" because they have already arrived.

The Defendants' interpretation fails for another simple reason: other applicants for admission who have been present continuously in the United States for years are not necessarily subject to expedited removal; they are generally governed by § 1229a in "Section 240 proceedings," referring to proceedings under Section 240 of the INA or "what might be called standard removal proceedings." Martinez v. Hyde, No. 25-11613-BEM, 2025 WL 1859273, at *1 (D. Mass. June 17, 2025), amended on reconsideration, 792 F. Supp. 3d 211 (D. Mass. 2025), appeal dismissed sub nom. Diaz Martinez v. Hyde, No. 25-1902, 2025 WL 4670604 (1st Cir. Dec. 23, 2025) (citing 8 U.S.C. § 1229a); Coal. for Humane Immigrant Rts., 805 F. Supp. 3d at 88 ("[S]ection 240 contains the standard removal proceedings in front of an IJ" (citing 8 U.S.C. §§ 1225, 1229a)).

Consider Section 1225(b)(2), which governs "arriving aliens" who are in the process of seeking admission – the statute provides that that all "other aliens" (meaning other than individuals that fall under the Arriving In Provision or, if/when designated, the Designation Provision) who are '"applicant[s] for admission' and who do not 'clearly and beyond a doubt' meet the criteria for admission 'shall be detained[7] for a proceeding under section 1229a of this title' (i.e., a section 240

[7] Detention is not yet a primary issue in this case because Plaintiffs do not allege they are presently detained; however, detention under Section 1225(b)(2) must be distinguished from discretionary detention under Section 1226(a). The Supreme Court has previously held that Section 1226(a) governs detention of noncitizens who are "*already in the country*." Jennings, 583 U.S. at 288–89 (emphasis added). Section 1226(a) applies to any alien who is arrested and detained "[o]n a warrant issued by the Attorney General," entitling a noncitizen to the "usual removal process," including a wider range of due process protections. Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 108 (2020). Section 1226(a) provides that the Attorney General or his designee: (1) "may continue to detain the arrested alien"; (2) "may release" the alien on "bond"; *or* (3) "may release" the alien on "conditional parole." 8 U.S.C. §§ 1226(a)(1)–(2). **Because Plaintiffs are not arriving aliens, should they be detained, they would be subject to detention under § 1226(a) and would be entitled to a bond hearing.** See Orellana IV, at *34. Hundreds of courts considering the issue in the context of habeas petitions have rejected the Government's interpretation of applying mandatory detention under Section 1225(b)(2) to all aliens and these courts routinely order bond hearings for noncitizens wrongfully classified as arriving aliens after being arrested within the

proceeding)." Coal. for Humane Immigrant Rts., 805 F. Supp. 3d at 88–89 (quoting 8 U.S.C. § 1225(b)(2)). For most noncitizens already in the country who are arrested and detained, Section 1226(a) governs their detention and pursuit of status through the "usual removal process" under Section 1229a. Thuraissigiam, 591 U.S. at 108, 119; De Andrade v. Moniz, 802 F. Supp. 3d 325, 329 (D. Mass. 2025)[8] ("8 U.S.C. § 1225 creates an expedited removal process for applicants for admission seeking to enter the United States. . . . 8 U.S.C. § 1226, in contrast, is the 'default rule 'for detaining non-citizens within the United States . . . pending the outcome of the 'usual removal process' under § 1229a" (citations omitted)). Accordingly, where the Plaintiffs in this case do not meet the criteria of the Arriving In Provision or the Designation Provision, treating them "in the same manner as that of any other applicant for admission,"[9] 8 U.S.C. § 1182(d)(5)(A), after

---

interior of the United States following years of residence. See e.g., Orellana I, 802 F. Supp. 3d 297; Gomes v. Hyde, 804 F. Supp. 3d 265 (D. Mass. 2025); Martinez, 792 F.Supp.3d 211; dos Santos v. Noem, No. 1:25-cv-12052-JEK, 2025 WL 2370988 (D. Mass. Aug. 14, 2025); Romero v. Hyde, et al., 795 F. Supp. 3d 271 (D. Mass. 2025); Diaz Diaz v. Mattivelo, No. 1:25-cv-12226, 2025 WL 2457610 (D. Mass. Aug. 27, 2025); Doe v. Moniz, 800 F. Supp. 3d 203 (D. Mass. 2025), appeal dismissed, No. 25-2095, 2025 WL 4722778 (1st Cir. Nov. 25, 2025); Contreras-Cervantes v. Raycraft, No. 2:25-CV-13073, 2025 WL 2952796, at *8 n.4 (E.D. Mich. Oct. 17, 2025), aff'd sub nom. Lopez-Campos v. Raycraft, 175 F.4th 713 (6th Cir. 2026) (collecting cases).

[8] In their response to the Show Cause Order, the Defendants cite De Andrade as authority for the proposition that a noncitizen whose parole expires remains an applicant for admission subject to expedited removal. [Defs.' Resp. to Show Cause Order at 10]. But the De Andrade court ruled against the government on that exact proposition, holding that "[t]he act of parole extinguished the legal fiction that a non-citizen who is physically present in the United States has, in fact, not effected an entry into the United States." 802 F. Supp. 3d at 332. The court further added, "once having entered, petitioner can no longer be treated as an 'applicant for admission' subject to expedited removal and mandatory detention under § 1225." Id. Finally, the De Andrade court admonished the government, noting that, once the petitioner was released on parole, the government "cannot now turn back the clock" and erase the four years the petitioner lived in the United States by subjecting him to mandatory detention and expedited removal meant for those just arriving into the country. Id. at 332.

[9] While Plaintiffs statutorily may be classified as "applicant[s] for admission" because they were never lawfully admitted into the United States, they are not considered to be "seeking admission"

expiration of their parole would likely result in discretionary detention under § 1226(a) while they pursue status under § 1229a. The Supreme Court confirmed in Clark v. Martinez, 543 U.S. 371, 385 (2005), that the parole statute, § 1182(d)(5)(A), does not affirmatively authorize detention after parole expiration, much less summary removal. The Government's reliance on this provision to restore arriving alien status reads into the statute a consequence Congress did not write.

**e. The Regulation Exceeds the Statutory Text**

Defendants' case, in large part, rests on 8 C.F.R. § 1.2, which declares that an arriving alien "remains an arriving alien even if paroled . . . and even after any such parole is terminated or revoked." But post-Loper Bright, this Court must exercise independent judgment on what "arriving in" means rather than deferring to the agency's preferred construction. See Loper Bright, 603 U.S. at 385. That independent judgment, grounded in the plain text, cannot permit a regulation's definition that transforms a present-tense process description enacted in a statute into a permanent, irrevocable legal status lasting indefinitely—regardless of how long someone has actually lived in this country. Defendants' application of the regulation goes further than the statute permits. The statute says "arriving in." 8 U.S.C. § 1225(b)(1)(A)(i). The regulation effectively says "forever, no matter what," with no limiting principle: parole could expire thirty years after entry, and under the Defendants' construction, that person would still be "arriving in." That extension cannot be sustained under Loper Bright. Moreover, as discussed above, the First Circuit has narrowed an analogous entry-fiction logic of deeming noncitizens who have completed their arrival and entry into the United States as "seeking admission" forever – even if the original entry to the country was unlawful. See Orellana IV, Nos. 25-2152, 26-1094.

---

requiring mandatory detention where they have already been present in the United States for an extended period of time. See Orellana I, 802 F. Supp. 3d at 308–09; Orellana IV, at *29.

The regulatory definition also conflicts with the statutory scheme explained above. Defendants argue that noncitizens are considered "arriving in" both when their parole is active and after it is terminated. See 8 C.F.R. § 1.2. However, this raises a conflict—"[t]o what 'status' does a noncitizen whose parole was revoked 'revert[ ]?' . . . It cannot be the 'status' of 'arriving alien'; [because] under 8 C.F.R. § 1.2, a parolee never leaves that status, even when their parole is active." Coal. for Humane Immigrant Rts., 805 F. Supp. 3d at 92. The conflict with 8 C.F.R. § 1.2, as well as the conflict analyzed in Coalition regarding 8 C.F.R. § 235.3(b)(6), highlight the following tension: "if the Arriving In Provision permitted the agency to subject a noncitizen to expedited removal even while that parole is active, this entire regulatory provision would be irrelevant." Id. Here, "the regulatory definition provides little insight into the statutory definition—the latter of which is [the Court's] concern." Id. (citing Loper Bright, 603 U.S. at 388 (explaining that courts interpreting a regulatory statute give more or less weight to an agency interpretation depending on '"the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control'" (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944))).

It is well established that "[a] regulation cannot expand the scope of the statute under which it is promulgated." Grupo Indus. Camesa v. United States, 85 F.3d 1577, 1579 (Fed. Cir. 1996) (citation omitted). Further, "[a]n agency interpretation that conflicts with the unambiguous meaning of the statute does not warrant any deference, even if that interpretation has been codified in a regulation." Kolster v. Ashcroft, 188 F. Supp. 2d 60, 63 (D. Mass. 2002) (citing Nat'l Labor Relations Bd. v. Beverly Enters. Mass., Inc., 174 F.3d 13, 22 (1st Cir. 1999)). Accordingly, this Court concludes that 8 C.F.R. § 1.2 has little persuasive value in interpreting § 1225(b)(1) and §

1182(d)(5)(A) because it is inconsistent with the statutory text to the extent it purports to maintain arriving alien status indefinitely through and after the expiration of humanitarian parole. See, e.g., Coal. for Humane Immigrant Rts., 805 F. Supp. 3d at 48; Rodriguez-Acurio v. Almodovar, 811 F. Supp. 3d 274, 305–07 (E.D.N.Y. 2025); E.V., 2025 WL 3122837, at *7–8 (holding that the time to subject noncitizens to expedited removal is when they present themselves to an immigration officer for inspection at a port of entry, not years later after having been released into the interior) (citing Coal. for Humane Immigrant Rts., 805 F. Supp. 3d at 89); cf. Orellana IV, Nos. 25-2152, 26-1094, at *19–21.

**f. The Statutory Structure Confirms This Reading**

The regulation's infirmity is reinforced by the structure of § 1225(b)(1) itself. Congress wrote the Designation Provision—§§ 1225(b)(1)(A)(iii)(I), (II)—to explicitly exclude those who have "been admitted or paroled" from expedited removal. That exclusion is a deliberate legislative choice. If the Arriving In Provision captured all parolees indefinitely through the regulation, the Designation Provision's exclusion of parolees would be largely superfluous for port-of-entry arrivals—Congress would have taken away with one hand what it expressly preserved with the other. Such an interpretation goes against canons of statutory construction. See Brown & Williamson Tobacco Corp., 529 U.S. at 133; Polansky, 599 U.S. at 432; Marx v. Gen. Revenue Corp., 568 U.S. 371, 386 (2013) ("the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.") (citation omitted). Further, the principle that noncitizens who have been present in the United States for an extended period are treated differently under the statute than those who have just arrived falls squarely within the traditions of this nation's immigration framework:

> [O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United

> States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely "on the threshold of initial entry."

Martinez, 792 F. Supp. 3d at 222 (quoting Leng May Ma v. Barber, 357 U.S. 185, 187 (1958)).

The Defendants' reading also creates a stark and perverse asymmetry. Someone who entered without inspection and has been here for three or more years cannot be subjected to expedited removal because the Designation Provision's two-year presence limit protects them. But someone who lawfully presented at a port of entry, submitted to inspection, and was paroled has more limited protection—they remain "arriving aliens" forever, according to the Defendants, regardless of how long they have lived here.[10] Congress does not punish compliance with lawful inspection procedures.

The reading that gives coherent meaning to both provisions requires finding that a grant of parole removes someone from the Arriving In Provision. The two-year continuous presence

---

[10] As the court explained in Coalition,

> Under [the construction urged by the Government], a noncitizen who snuck into the country outside of an inspection point gets a full section 240 removal hearing as long as they have been physically present in the United States for two years. By contrast, a noncitizen who entered at an inspection point and was paroled after inspection can face expedited removal forever, regardless of how long they have been physically present in the United States. Defendants offer no explanation for such a counterintuitive result, nor does the legislative history show that Congress intended that result. Quite the opposite: such a result flies in the face of the House Report's statement that [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996] was intended to "replace certain aspects of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry." H.R. 104-469 at 225.

Coal. for Humane Immigrant Rts., 805 F. Supp. 3d at 93.

limitation in the Designation Provision reinforces this conclusion independently. Congress expressly barred expedited removal of anyone who has been continuously present in the United States for two or more years. Plaintiffs have been here for nearly a decade. Whatever provision of § 1225(b)(1) the Defendants invoke, the government cannot execute an expedited removal order against persons whom Congress specifically placed outside the reach of summary removal by virtue of their long-term presence. To hold otherwise would allow the government to circumvent the two-year limit entirely—simply by declining to execute an order until convenient, no matter how many years have passed. That cannot be what Congress intended.

**g. <u>Plaintiffs Have Demonstrated a Likelihood of Success on the Merits that the Government Is Subjecting Them to a Statutory Scheme That Does Not Apply to Them</u>**

For the reasons stated above, the Court finds that expiration of Plaintiffs' humanitarian parole does not render them "arriving aliens" subject to expedited removal under § 1225(b)(1)(A)(i). The statutory text, the structure of § 1225(b)(1) as a whole, the two-year continuous presence limitation in the Designation Provision, and the proper construction of § 1182(d)(5)(A) all point in the same direction. Should Plaintiffs ultimately fail to obtain legal status, Plaintiffs' removal cannot be executed through the expedited removal process because they are persons who are no longer—in any meaningful statutory sense—"arriving in" the United States and they are exempted from being designated for expedited removal under the Designation Provision.

Because Plaintiffs have prevailed on demonstrating a likelihood of success on the merits of their claims in Counts I and II that Defendants are exceeding their statutory authority in subjecting Plaintiffs to expedited removal, all factors warranting preliminary injunctive relief

weigh in the Plaintiffs' favor. The motion for preliminary injunction is **GRANTED**, the specific terms of which are stated at the end of this Order.

### C. Motion to Dismiss for Failure to State a Claim

As articulated above, the standard for likelihood of success on the merits sets a higher burden for Plaintiffs than the standard for stating a plausible claim upon which relief can be granted under Rule 12(b)(6). Faust, 2013 WL 3933021, at *9 (quoting Cryer, 2012 WL 892883, at *9). Accordingly, for the reasons stated in the previous section, Plaintiffs have alleged sufficient facts to state a cognizable and plausible legal theory for their claims under Counts I and II. The Court next turns to analyzing the merits of Count III, which alleges that Plaintiffs' placement in expedited removal proceedings as opposed to Section 240 proceedings amounts to a violation of their due process rights.

#### 1. Due Process

Defendants first challenge whether Plaintiffs are entitled to due process protections under the U.S. Constitution, asserting that, since Plaintiffs were never admitted into the United States, they remain "applicants for admission" under the immigration statutes and they are merely protected by rights provided by those statutes. [Defs.' MTD Mem. at 22–23]. The Court follows the analysis of Judge Murphy in Rincon v. Hyde, in finding that noncitizens like Plaintiffs, who have lived in the United States with relative freedom for years, are fundamentally different from a person stopped upon entry into the United States (or shortly after), notwithstanding the "so-called entry fiction doctrine, whereby a non-citizen physically present in the United States is treated 'as if stopped at the border' for purposes of due process." 810 F. Supp. 3d 101, 110–11 (D. Mass.

2025) (quoting Thuraissigiam, 591 U.S. at 139)[11]. It is settled law that the Due Process clause applies to noncitizens *within* the United States "whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas, 533 U.S. at 693 (emphasis added); Trump v. J.G.G., 604 U.S. 670, 673 (2025) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." (internal quotation marks omitted) (quoting Reno v. Flores, 507 U.S. 292, 306 (1993)). Because Plaintiffs are already *within* the United States and are not "arriving," they are entitled to the full protection of the Due Process Clause. See Zadvydas, 533 U.S. at 693.

The Due Process Clause of the Fifth Amendment protects all persons within the United States from being "deprived of life, liberty, or property, without due process of law." U.S. CONST. AMEND. V. Once the Court determines that due process applies, "the question remains what process is due." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Plaintiffs allege a violation of their procedural due process rights. [Compl. ¶¶ 81–85]. The Court follows the lead of other courts considering due process challenges to immigration detention and applies the three-part test of Mathews v. Eldridge, 424 U.S. 319, 335 (1976) to analyze whether Plaintiffs adequately state due process claim. See Hernandez-Lara, 10 F.4th at 27–28 (applying the Mathews factors to consider

---

[11] Defendants cite Thuraissigiam as holding an "applicant for admission 'has only those rights regarding admission that Congress has provided by statute" and "the Due Process Clause provides nothing more. . . .'" [Defs.' MTD Mem. at 2–3 (quoting Thuraissigiam, 591 U.S. at 139)]. However, the actual language from Thuraissigiam states, "[a]n alien in *respondent's* position, therefore, has only those rights regarding admission that Congress has provided by statute." 591 U.S. at 140. Here, Plaintiffs' positions are distinguishable from Thuraissigiam's position. Mainly, they are not a mere twenty-five yards over the border as they seek to claim their constitutional rights. Plaintiffs have lived with relative freedom in the United States for over a decade and are now being subjected to expedited removal meant for noncitizens who are truly just arriving in the United States. See Rincon, 810 F. Supp. 3d at 110–12 (distinguishing Thuraissigiam and finding it inappropriate to apply the "entry-fiction doctrine" to petitioner who has been present in the United States for four years because claiming "Petitioner was never really 'here' . . . requires a much greater sleight of hand than is provided for in [Thuraissigiam]").

a due-process claim as to immigration detention); Rincon, 810 F. Supp. 3d at 114–16 (applying the Mathews factors in a habeas immigration detention context, finding a due process violation, and ordering a bond hearing as remedy); Tenemasa-Lema v. Hyde, 810 F. Supp. 3d 244, 253 (D. Mass. 2025) (explaining why analysis under Mathews is appropriate for a claim that detention based on the mandatory detention statute applicable to arriving aliens is unconstitutional as applied to a noncitizen already present for years in the United States); see also Pinchi v. Noem, 792 F. Supp. 3d 1025, 1033 n.2 (N.D. Cal. 2025) (collecting cases where courts applied the Mathews factors to due process challenges to immigration detention); Black v. Decker, 103 F.4th 133, 147–48 (2d Cir. 2024) (the Second Circuit, citing the First Circuit's decision in Hernandez-Lara, and concluding that procedural due-process challenges to detention under section 1226(c) should be analyzed under Mathews).

**a. *Mathews* Factors**

Upon review of the Mathews factors, the Court finds that Plaintiffs have plausibly alleged that inappropriately subjecting them to the expedited removal framework under Section 1225(b)(1) instead of Section 1229a deprives them of a statutory process that they would otherwise be entitled to – a deprivation which plausibly rises to a due process violation.

> The Mathews factors are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Hernandez-Lara, 10 F.4th at 28 (quoting Mathews, 424 U.S. at 335).

**i. Private Interest**

Although noncitizens do not have a legally protected liberty interest in remaining in the United States, a noncitizen "possesses an identifiable liberty interest in being accorded 'all

opportunity to be heard upon the questions involving his right to be and remain in the United States' before being deported." Rusu v. U.S. I.N.S., 296 F.3d 316, 321 n.8 (4th Cir. 2002) (quoting Yamataya v. Fisher (The Japanese Immigrant Case), 189 U.S. 86, 101 (1903)). Here, Plaintiffs' interest falls within that promise that people in their position will have "all opportunity to be heard." Id. Plaintiffs argue that by subjecting them to a summary removal process designed for recent entrants and individuals who have not been admitted or paroled, Defendants deprive Plaintiffs of procedural protections guaranteed to individuals *within* the United States, pursuant to Section 240 proceedings under 8 U.S.C. § 1229a. [Compl. ¶ 81, 83 (emphasis added)]. In other words, proceedings under Section 240 provide greater procedural protections for Plaintiffs than expedited removal proceedings under Section 235. Although Plaintiffs' "interest is, in these circumstances, substantially attenuated, it remains a cognizable interest within the Mathews v. Eldridge framework." Rusu, 296 F.3d at 321 n.8.

**ii. Risk of Erroneous Deprivation**

To analyze "the risk of an erroneous deprivation of [Plaintiffs'] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," the Court must compare Plaintiffs' procedural safeguards under Section 235 proceedings versus standard Section 240 proceedings. See Mathews, 424 U.S. at 335.

The court in Coalition provided a comprehensive comparison of the two removal processes. The Court finds this analysis instructive and, after reviewing for accuracy, reproduces the court's explanation of the two processes below.

> In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRAIRA"), Congress established two main processes for removing noncitizens deemed ineligible to enter or remain in the United States. See IIRAIRA, Pub. L. 104-208, 110 Stat. 3009, 3009-546 (1996). The first, commonly referred to as "section 240" proceedings due to the statutory section in which they appear, are the standard mechanism for removing inadmissible noncitizens. Section 240

removal proceedings take place before an IJ, an employee of the Department of Justice (DOJ) who must be a licensed attorney and has a duty to develop the record in cases before them. 8 U.S.C. §§ 1229a(a)(1), (b)(1) ("The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses."); [citation omitted]. They are adversarial proceedings in which the noncitizen has the right to hire counsel, examine and present evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). The hearings are recorded, and a transcript is made available if a party appeals the decision. Id. § 1229a(b)(4)(C); [citation omitted]. A section 240 proceeding typically takes place over the course of multiple hearings due to the built-in procedures. [Citation omitted]. This allows time for noncitizens to both gather evidence in support of petitions for relief available in immigration court (like asylum and certain adjustments of status) and seek collateral relief from other components of DHS (like adjustment of status on the basis of marriage or family). [Citation omitted]. Upon a decision by the IJ, either party may appeal to the Board of Immigration Appeals (BIA). 8 C.F.R. §§ 1240.15, 1003.1. If the BIA upholds a removal order, the noncitizen may then appeal that decision to a U.S. court of appeals. 8 U.S.C. § 1252.

[. . .]

IIRAIRA included a second, even more streamlined form of proceeding applicable only to certain noncitizens: expedited removal. Relative to section 240 removal, "[e]xpedited removal lives up to its name." Make the Rd. New York v. Wolf, 962 F.3d 612, 619 (D.C. Cir. 2020). In expedited removal, an immigration officer, not an IJ, conducts the initial fact-finding. 8 C.F.R. § 235.3(b)(2)(i). If a noncitizen is eligible for expedited removal, an immigration officer asks them a short series of questions to determine (a) their "identity, alienage, and inadmissibility," and (b) whether they intend to apply for asylum, fear persecution or torture, or fear returning to their country of origin. Id. § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this questioning, and no recording or transcript is made. [Citation omitted]; compare 8 C.F.R. § 235.3(b)(2)(i) with 8 U.S.C. § 1229a(b)(4)(C). If the noncitizen is inadmissible and does not indicate intent to apply for asylum or fear of persecution or torture, the inspecting officer issues a Notice and Order of Expedited Removal (NOER), and the noncitizen may respond in a sworn statement. 8 C.F.R. § 235.3(b)(2)(i). Once a supervising officer reviews and signs off on the inspecting officer's determination, the noncitizen is ordered removed. See id. The noncitizen has no right to appeal that decision to an IJ, the BIA, or (with one exception discussed below) any court. Id. § 235.3(b)(2)(ii); 8 U.S.C. § 1252(a)(2)(A)(i).

"The process is scarcely more involved" if the noncitizen "assert[s] an intention to apply for asylum or a fear of prosecution." Make the Rd., 962 F.3d at 619. If the noncitizen so indicates, the inspecting officer must refer them to a "credible fear interview," to be conducted by an asylum officer. 8 C.F.R. § 235.3(b)(4). If that asylum officer finds the noncitizen to have a credible fear of persecution, the noncitizen will be moved either to full section 240 removal

> proceedings or to USCIS administrative asylum proceedings. Id. § 208.30(f). If, however, the officer makes a negative credible fear determination, a supervisory officer will review the determination. Id. § 208.30(e)(8). And if the supervisor agrees, the noncitizen can request review by an IJ. Id. § 208.30(g). The IJ's review "is meant to conclude within 24 hours" and is final. Make the Rd., 962 F.3d at 619. With narrow exceptions discussed below, no further administrative or judicial review is available. Id.
>
> Unlike section 240 proceedings, which often take place over the course of several months, the expedited removal process is "conducted on a very compressed schedule and can result in deportation in hours or days." [Citation omitted; see Make the Rd., 962 F.3d at 619]. As a result, noncitizens subject to expedited removal have little time to secure counsel—and no right to a continuance to give them time to do so. Id. And although the noncitizen may bring counsel to their credible fear interview, they typically have only a short window (24 to 48 hours on average) to secure counsel and ensure they can attend the interview. [Citation omitted]. Meanwhile, asylum officers have no explicit duty to advise noncitizens of their rights or the requirements for relief. [Citation omitted]. That fast pace also gives noncitizens little time to prepare evidence related to their credible-fear claim. [Citation omitted]. Further, noncitizens in expedited removal have no way to pursue any other immigration relief besides asylum, such as adjustment of status or family-based petitions (e.g., for marriage)—even if they are eligible and were pursuing them before entering expedited removal. [Citation omitted]. Only if they establish credible fear and return to section 240 proceedings can they then continue to pursue those other forms of relief. [Citation omitted]. Compounding all those challenges, noncitizens are typically detained pending the outcome of their expedited removal proceedings, often in remote locations that may be far from their counsel or families. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii); [citation omitted].

Coal. for Humane Immigrant Rts., 805 F. Supp. 3d at 58–60. As Judge Cobb further details, and as discussed in the preceding jurisdictional analysis, IIRAIRA provides several provisions that seek to bar "almost any role for judicial review" regarding expedited removal. Id. at 60–61.

The Plaintiffs in this case identified similar differences between Section 235 and Section 240 proceedings where Section 235 proceedings significantly curtail Plaintiffs' legal protections and ability to fully contest their removability. [Hr'g Tr. 10:5–13:1]. Plaintiffs highlighted that in Section 240 proceedings, noncitizens get a right to counsel; a hearing where they can present their own evidence; an ability to apply for a full variety of immigration relief, including asylum, family

petitions, employment petitions, and humanitarian petitions; adjudication by a neutral Immigration Judge instead of an officer employed by the enforcement agency (DHS); as well as appellate rights to the BIA. [Id.; Compl. ¶¶ 83–84]. In arguing why being placed in Section 235 proceedings results in prejudice, Plaintiffs noted the absence of these protections in Section 235 proceedings, emphasized that the risk of erroneous removal is higher in Section 235 proceedings because a petitioner is not able to present evidence to bolster their claims of credible fear, and because the decision is left to an asylum officer employed by DHS. [Hr'g Tr. 11:21–12:1].

Courts have recognized that different immigration pathways may require different levels of notice procedures and opportunity to be heard. In Trump v. J.G.G. the Supreme Court considered the detention and removal of Venezuelan nationals pursuant to the Alien Enemies Act ("AEA"), Rev. Stat. § 4067, 50 U.S.C. § 21, where the noncitizen plaintiffs challenged the government's interpretation of the AEA and asserted that they do not fall within the category of removable alien enemies under that statute. 604 U.S. 670. Although it withheld a merits ruling, the majority did find that individuals subject to removal under the AEA are entitled to adequate notice and judicial review before they can be removed, and the Court highlighted the precedent of Mullane v. Central Hanover Bank & Trust Co., noting "the detainees are entitled to notice and opportunity to be heard 'appropriate to the nature of the case.'" Id. at 673 (quoting Mullane, 339 U. S. 306, 313 (1950)). The notion that notice and hearing procedures might be particular to a noncitizen's pathway within the immigration scheme was also emphasized in Rusu: "what constitutes being heard at 'a meaningful time and in a meaningful manner' will have different meanings in different circumstances, and due process only 'calls for such procedural protections as the particular situation demands.'" 296 F.3d at 321 (quoting Mathews, 424 U.S. at 333–34). Even when recognizing that procedural rights in the immigration context may be more limited than

in other types of government-conducted proceedings, the Rusu court concluded, "[n]evertheless, due process requires, at a minimum, that the INS adopt procedures to ensure that asylum petitioners are accorded an opportunity to be heard at a meaningful time and in a meaningful manner, i.e., that they receive a full and fair hearing on their claims." Id. at 321–22 (citing Jacinto v. I.N.S., 208 F.3d 725, 727 (9th Cir.2000) (other citations omitted)).

While noting that "an alien is entitled to a fair hearing, not necessarily a perfect one," Pulisir v. Mukasey, 524 F.3d 302, 311 (1st Cir. 2008), the First Circuit stated in Santosa v. Mukasey, "[a]n alien in an immigration proceeding is entitled to 'a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government . . . .'" 528 F.3d 88, 93 (1st Cir. 2008) (quoting 8 U.S.C. § 1229a(b)(4)(B)). In Santosa, the First Circuit did not distinguish between "arriving aliens" or those already present in the United States, and, notably, the Appellate Court cited to Section 1229a in articulating the procedures to which noncitizens are entitled. Id. Thus, the First Circuit's default understanding of what protections a noncitizen is guaranteed rests in Section 240 proceedings, not expedited removal.

Santosa also articulated that a noncitizen "must show prejudice in order to succeed on a due process claim," and "[p]rejudice is found where 'an abridgment of due process is likely to have affected the outcome of the proceedings.'" Id. at 94 (first citing Alsamhouri v. Gonzales, 484 F.3d 117, 125 (1st Cir. 2007) then quoting Pulisir, 524 F.3d at 311). In the present case, Plaintiffs have plausibly demonstrated that they are prejudiced by the diminished legal protections in Section 235 proceedings as opposed to Section 240 proceedings. Plaintiffs did have a credible fear interview, in which the asylum officer returned a negative determination. [Compl. ¶ 46]. The negative credible fear determination was reviewed and affirmed by an IJ. [Id.] However, if

Plaintiffs were in Section 240 proceedings, they would be able to seek further appellate review to the BIA. Additionally, they may be given an opportunity to seek another pathway to legal status other than asylum. The presentation on credible fear could be stronger should Plaintiffs have a guaranteed right to counsel and an ability to produce evidence. The deprivation of these protections amounts to prejudice that is cognizable for a due process claim.

Accordingly, Plaintiffs have plausibly alleged that their placement in Section 235 proceedings poses a risk of erroneous deprivation of their protected interests in "being accorded 'all opportunity to be heard upon the questions involving his right to be and remain in the United States' before being deported," Rusu, 296 F.3d at 322 n.8 (citation omitted), and that the additional procedural safeguards provided in Section 240 proceedings have a strong probable value. See Mathews, 424 U.S. at 335.

**iii. Government Interest**

Finally, the Court considers the government interest at stake, "which ultimately entails an assessment of the public interest." Tenemasa-Lema, 810 F. Supp. 3d at 258 (cleaned up) (quoting Hernandez-Lara, 10 F.4th at 32); Mathews, 424 U.S. at 335. In considering the balance of the equities and the public interest for a preliminary injunction, the court in Chogllo Chafla held, "[a]lthough the Government has a legitimate interest in the 'prompt execution of removal orders,' . . . 'there is a public interest in preventing aliens from being wrongfully removed[.]'" Chogllo Chafla, 2025 WL 2531027, at *3 (first quoting Hernandez-Lara, 10 F.4th at 32 then quoting Nken, 556 U.S. at 436). The same reasoning applies here. Moreover, "the Government and public can have little interest in executing removal orders that are based on statutory violations[,]" like the kind Plaintiffs allege in this action. A.B.-B. v. Morgan, 548 F. Supp. 3d 209, 222 (D.D.C. 2020) (citing League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is

generally no public interest in the perpetuation of unlawful agency action."). This is especially true "where those statutory violations may compromise the accuracy of such removal orders." Id. (citing R.I.L-R. v. Johnson, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)). In sum, while providing Plaintiffs more fulsome legal protections under Section 240 would engender a higher "administrative burden[,]" see Mathews, 424 U.S. at 335, than expedited removal proceedings, Defendants' interests cannot outweigh Plaintiffs' where Plaintiffs plausibly argue that their placement in Section 235 proceedings amounts to unlawful agency action and a violation of the INA.

In conclusion, the Court finds that the Mathews factors weigh in favor of relief, that Plaintiffs have met their burden in plausibly alleging that improper placement in expedited removal proceedings violates their due process rights, and that an additional procedure to protect their rights would be to place them in removal proceedings under Section 1229a. Accordingly, Plaintiffs have plausibly stated a claim for a due process violation and the motion to dismiss is **DENIED** on Count III.

## V. CONCLUSION

For the reasons stated above, the Court orders the following:

A. The motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim, [ECF No. 14], is DENIED.

B. Plaintiffs' motion for preliminary injunction [ECF No. 1 ¶ 100] is GRANTED IN PART[12]:

[12] The Court declines to issue Plaintiffs' full request for injunctive relief until a final ruling on the merits is made.

(1) Defendants, their officers, agents, employees, and all persons acting in concert with them are preliminarily enjoined from removing Plaintiffs pursuant to expedited removal proceedings under 8 U.S.C. § 1225(b)(1);

(2) Defendants may not remove or detain Plaintiffs while this action is pending;

(3) Defendants are to refrain from taking any action that would effectuate Plaintiffs' removal under the challenged statutory framework;

(4) The court has discretion in ordering plaintiffs to post a bond prior to the issuance of the preliminary injunction. See Pineda v. Skinner Servs., Inc., 22 F.4th 47, 57 (1st Cir. 2021). Here, the preliminary injunction is ordered without a requirement that Plaintiffs post a bond.

**SO ORDERED.**

Dated: August 17, 2026

/s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge